UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRAIG N.,[1] | Case No.  19-cv-05235-TSH |
| Plaintiff, | |
| | **ORDER RE: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR REMAND** |
| v. | |
| ANDREW SAUL, | |
| Defendant. | Re: Dkt. Nos. 16, 19 |

## I.    INTRODUCTION

Plaintiff Craig N. brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of Defendant Andrew Saul, Commissioner of Social Security, denying Plaintiff's claim for disability benefits.  Pending before the Court is Plaintiff's Motion for Summary Judgment and Defendant's Cross-Motion That Remand for Further Proceedings Is Necessary and in Opposition to Plaintiff's Motion for Summary Judgment.  ECF Nos. 16 (Pl.'s Mot.), 19 (Def.'s Mot.).  Pursuant to Civil Local Rule 16-5, the motions have been submitted without oral argument.  Having reviewed the parties' positions, the Administrative Record ("AR"), and relevant legal authority, the Court hereby **GRANTS** each side's motion **IN PART** and **DENIES** them both **IN PART** for the following reasons.

## II.    BACKGROUND

### A.    Age, Education and Work Experience

Plaintiff is 56 years old.  AR 71.  He completed the 11th grade in school.  AR 341.  The

---

[1] Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

United States District Court
Northern District of California

1  last time he worked was in 2001, as a shipping and receiving worker at a department store.  AR

2  39-40.

3  **B.    Medical Evidence**

4  **1.    Dr. Castro's Assessment and Plan**

5  On January 10, 2013, Dr. Emma Castro, M.D., completed a general psychiatric assessment

6  and plan for Plaintiff after he was referred for complaining of anxiety, depression, irritability,

7  insomnia, nightmares, and auditory hallucinations.  AR 283-93.  Plaintiff complained of isolation

8  and being afraid to go out and forgetfulness.  AR 284.  Plaintiff reported that he drank about 64

9  ounces of beer daily and that his last drink was the day before.  AR 284, 285.  Plaintiff reported

10  that his brother had been murdered in 2004 in his neighborhood.  AR 285.

11  Dr. Castro noted that Plaintiff was oriented to place, person and time and was engaged;

12  that he had an alert sensorium, poor grooming, pressured speech, manic mood, labile affect, poor

13  insight, a logical thought process, and poor judgment.  AR 286.  Dr. Castro noted that Plaintiff

14  exhibited no suicidal or homicidal ideations, no auditory or visual hallucinations, and no

15  delusions.  *Id*.  She diagnosed Plaintiff with unspecified bipolar disorder, psychotic disorder not

16  otherwise specified, alcohol abuse, and nicotine dependence.  She assigned Plaintiff a Global

17  Assessment of Functioning ("GAF") score of 50 (serious symptoms or difficulties).[2]  *Id*.  She

18  prescribed Plaintiff Olanzapine[3] for his mood.  *Id*.  Dr. Castro indicated that her contact with

19  Plaintiff was his first with a psychiatrist, and that the incident was his first psychotic break.  *Id*.

20  **2.    LCSW Sondecker's Treatment Notes**

21  Therapist James Sondecker, LCSW, met with Plaintiff from October 15, 2013 to May 15,

22  2014.  AR 294-95, 296-98, 312-13, 351-52.

23

24  [2] A GAF score in the range of 41-50 reflects "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  https://www.webmd.com/mental-health/gaf-scale-facts (last visited Apr. 10, 2020);

25

26  https://www.albany.edu/counseling_center/docs/GAF.pdf (last visited Apr. 10, 2020).

27  [3] Olanzapine is an atypical antipsychotic used to treat the symptoms of schizophrenia and bipolar disorder in adults and teenagers 13 years of age and older.

28  https://medlineplus.gov/druginfo/meds/a601213.html (last visited Apr. 20, 2020).

United States District Court
Northern District of California

United States District Court
Northern District of California

Sondecker's case consultation notes from October 15, 2013 indicated that Plaintiff presented with depressed mood, difficulty concentrating, diminished interest or pleasure, excessive worry, fatigue, racing thoughts, restlessness and excessive appetite.  AR 296. Concerning mental status, he noted that Plaintiff's appearance was appropriate; he was oriented to person, place, time, and situation; his behavior was unremarkable, speech was appropriate, memory was intact, sensorium was clear consciousness, intellect was average, impulse control was fair, judgment was fair, psychomotor behaviors were restless, affect was flat, mood was anxious and depressed, attitude was discouraged, attention was gained, insight was poor, self-perception was abasing, and thought processes were circumstantial; and he had auditory hallucinations.  AR 297-98.  Sondecker gave Plaintiff an initial GAF score of 60 (moderate symptoms or difficulties)[4], and assessed severe Axis IV problems related to education, finances, occupation, primary group support, and social environment.  AR 298.  He indicated that Plaintiff had been using Olanzapine since January 2013 and that "[h]e has improved on Olanzapine, less depression, auditory hallucinations reduced, sleep normal and has not drank to intoxication."  AR 297-98.  His initial diagnosis was depression, along with other and unspecified alcohol dependence, episodic drinking behavior.  AR 298.  He opined that Plaintiff "may benefit from group therapy however, I feel he will benefit after his medication concerns are assessed."  *Id.*  He referred Plaintiff to a doctor for medication evaluation and asked him to return to re-assess him for psychotherapy after a psychiatric consult.  *Id.*

On January 7, 2014, Sondecker indicated no change in Plaintiff's mental status.  AR 294. However, he noted Plaintiff's depression had improved.  *Id.*  Plaintiff told Sondecker of his plans to apply for SSI.  *Id.*  Sondecker declined to fill out an application for a disability transit card for Plaintiff, since he felt Plaintiff's mental health problems did not meet the eligibility criteria.  *Id.*

---

[4] A GAF score in the range of 51-60 reflects "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." https://www.webmd.com/mental-health/gaf-scale-facts (last visited Apr. 10, 2020); https://www.albany.edu/counseling_center/docs/GAF.pdf (last visited Apr. 10, 2020).

United States District Court
Northern District of California

1  Plaintiff "went into extensive details on how he needed the pass from a monetary basis so he did

2  not need to ask his mother for money." *Id*. Sondecker changed Plaintiff's GAF score to 70

3  ("Some mild symptoms or some difficulty in social, occupational, or school functioning, but

4  "generally functioning pretty well")[5], and re-assessed Plaintiff with only moderate Axis IV

5  problems related to education, finances, and occupation. AR 295. He noted that Plaintiff's

6  cognitive status was logical, and that his reasoning for wanting the disability transit card was

7  "based on reduced expense." AR 294. Sondecker felt that Plaintiff did not need psychotherapy.

8  AR 295. He noted that Plaintiff had stable housing and was satisfied with his current lifestyle, and

9  he found that Plaintiff's presentation suggested secondary gains. *Id*.

10       On February 13, 2014, Sondecker again indicated no change in Plaintiff's mental status.

11  AR 312. He noted that Plaintiff was "managing on Zyprexa [(Olanzapine)]," with "no complaints

12  of adverse reaction, sleep normal." *Id*. He noted that Plaintiff was "highly dependent" on his

13  mother and that "[h]is functional level may be more compromised than I found in initial

14  evaluation and not clear if dependency trait or internal preoccupation." *Id*. However, he opined

15  that Plaintiff did not need group therapy and noted that Plaintiff was "not interested in change with

16  his social isolation." AR 313.

17       On May 15, 2014, Sondecker noted that Plaintiff had requested the appointment after his

18  Homeless Action advocate sent him to a psychological assistant for an independent assessment for

19  his SSI application. AR 351. Sondecker discussed medical assessment options with Plaintiff. *Id*.

20  He opined that Plaintiff was stable and "not a candidate for psychotherapy. Not a danger to self or

21  others." *Id*.

22       **3.    Dr. Van Gaasbeek's Comprehensive Psychiatric Evaluation**

23       On March 7, 2014, Dr. Kyle van Gaasbeek, Psy.D., completed a comprehensive

24

---

25  [5] A GAF score in the range of 61-70 reflects "some mild symptoms (e.g. depressed mood and mild
26  insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional
   truancy, or theft within the household), but generally functioning pretty well, has some meaningful
27  interpersonal relationships." https://www.webmd.com/mental-health/gaf-scale-facts (last visited
   Apr. 10, 2020); https://www.albany.edu/counseling_center/docs/GAF.pdf (last visited
28  Apr.10, 2020).

psychiatric evaluation on Plaintiff. AR 314-17. Dr. Van Gaasbeek noted that Plaintiff's chief complaint was depression. AR 314. He noted Plaintiff was taking Zyprexa. *Id.* Plaintiff reported never having been psychiatrically hospitalized. AR 315. Dr. Van Gaasbeek noted that Plaintiff's persistence and pace were adequate, and his concentration was good. AR 315, 316. He noted that Plaintiff's grooming was marginal; he was polite and cooperative and had no unusual behaviors; some of his mental activity or speech tendencies were "tangential" and he was "not always easily redirected;" his thought content was appropriate, with "no indications of recent suicidal thoughts or psychotic symptoms;" and his affect was calm. AR 315-16. Dr. Van Gaasbeek estimated Plaintiff's baseline intellectual functioning to be in the low-average range. AR 316. He noted that Plaintiff was "alert and oriented in all spheres, time, person, place and purpose;" that his immediate recall was good, his recent memory poor, and his past memory good. *Id.* Plaintiff's fund of knowledge was fair, his ability to make calculations limited, his abstract thinking fair, and his judgment adequate. *Id.*

Dr. Van Gaasbeek diagnosed Plaintiff with moderate major depressive disorder, and alcohol abuse in partial remission. *Id.* He opined that Plaintiff's depression was treatable. AR 317. He gave Plaintiff a GAF score of 50 (serious symptoms or difficulties). *Id.* He completed a functional assessment and medical source statement of Plaintiff. He determined that: Plaintiff was capable of managing his own funds; his ability to perform simple and repetitive tasks was unimpaired; his ability to perform detailed and complex tasks was mildly impaired; his ability to accept instructions from supervisors was unimpaired; his ability to interact with coworkers and the public was at least moderately impaired; his ability to perform work activities on a consistent basis without special or additional instructions was unimpaired; his ability to maintain regular attendance in the workplace was at least mildly impaired; his ability to complete a normal workday without interruptions from a psychiatric condition was moderately impaired; and his ability to deal with the usual stress encountered in the workplace was at least moderately impaired. *Id.*

### 4.     Dr. Walser's Psychological Evaluation

On May 25, 2014, Dr. Elizabeth Walser, WSW, Psy.D., under the supervision of Dr.

United States District Court
Northern District of California

1   Lesleigh Franklin, Ph.D., completed a psychological evaluation of Plaintiff.  AR 340-49.  Plaintiff

2   complained of depression, anxiety, agitation, obsessiveness, suicidal and homicidal ideation, and

3   transient auditory hallucinations.  AR 340.  After a mental status examination, the evaluation

4   noted that Plaintiff was poorly groomed; was oriented to person, place, time, and purpose; was

5   able to concentrate and had adequate long-term memory; was cooperative, though he made one

6   veiled threat about losing control if the evaluator could not speed up the evaluation; was mildly

7   hostile, argumentative, and exhibited low frustration tolerance; was affectively labile, anxious,

8   depressed and irritable; had pressured speech and tangential though process, but did not appear

9   internally preoccupied during the evaluation; admitted to some suicidal and homicidal ideation but

10  expressed no plans to act on those thoughts because he felt it would hurt people in his life; and

11  demonstrated poor insight and fair to poor judgment.  AR 344.  The evaluation indicated that

12  Plaintiff put forth adequate effort in all aspects of testing.  *Id.*

13          Test results of the Wechsler Abbreviated Scale of Intelligence, Second Edition (WASI-2)

14  showed low-average verbal comprehension (standard score of 86), borderline perceptual reasoning

15  (score of 70), and a Full 4 IQ ("FSIQ-4") score of 76, in the borderline range.  AR 345.  Dr.

16  Walser assessed that Plaintiff would likely be very challenged by spatial relationship activities and

17  tasks that require complex reasoning.

18          Results of the Repeatable Battery for the Assessment of Neuropsychological Functioning

19  (RBANS) showed low-average immediate memory (score of 83), extremely low

20  visuospatial/constructional processing (score 62), average language and attention functioning

21  (mean scores of 100), borderline functioning in delayed memory (score 75), and a total scale score

22  of 78, in the borderline range.  *Id.*  Dr. Walser noted that Plaintiff had mild difficulties with a list-

23  learning task, and his auditory recognition memory was fair.  *Id.*  He demonstrated problems with

24  visual processing and had a below average ability to replicate a complex figure; Dr. Walser felt

25  that was an area of weakness for Plaintiff.  AR 345-46.  However, Plaintiff "only had mild

26  trouble" on a semantic fluency task and performed "above average" on an attention index task

27  (though Dr. Walser ultimately assigned an average attention score), though he performed slowly

28  and below average on a coding task.  AR 346.  Dr. Walser noted that because of variability within

and between Plaintiff's scores on the RBANS, his overall score "should be interpreted with caution." *Id.*

On Trail Making Test A, Plaintiff worked slower than average but did not make any errors. On Test B, he made several errors and scored within the impaired range. Results suggested trouble with complex executive functioning tasks and possible trouble with frustration tolerance when challenged in mental activities. Plaintiff's score on the Mini Mental Status Exam was 28 out of 30, which indicates only mild intellectual impairment. Plaintiff's score on the Miller Forensic Assessment of Symptoms Test ("M-FAST") was five, which indicates more psychological distress than is common, but was "below the threshold used to determine malingering." The symptoms he endorsed on the M-FAST were related to psychosis and depression. AR 346.

Dr. Walser diagnosed Plaintiff with major depressive disorder with psychotic features; obsessive-compulsive disorder; alcohol use disorder; antisocial personality trains; borderline intellectual functioning. AR 348. She assessed that Plaintiff had mild impairment in his ability to understand, remember, and carry out very short and simple instructions, and ability to maintain attention and concentration for two-hour segments; moderate impairment in ability to understand, remember and carry out detailed instructions, and ability to perform at a constant pace without an unreasonable number and length of rest periods; and extreme impairment in ability to get along and work with others, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in routine work settings and deal with normal work stressors, complete a normal workday and workweek without interruptions from psychologically-based symptoms, and maintain regular attendance and punctuality within customary tolerances. AR 349.

### 5.     LMFT DeSouza's Mental Impairment Questionnaire

From December 17, 2014 to March 9, 2016, Plaintiff saw therapist Ryann DeSouza, LMFT. AR 392-405. DeSouza completed a mental impairment questionnaire on Plaintiff on March 31, 2016. AR 387-90. She diagnosed Plaintiff with PTSD and bipolar disorder. She assessed problems with family and friends under Axis IV and assigned a GAF score of 55 (moderate symptoms or difficulties). She stated that Plaintiff's PTSD impaired his ability to

United States District Court
Northern District of California

1    interact with others in any work or social situations, and that his depressive symptoms impaired

2    his activities of daily living, energy and concentration.  AR 387.

3         DeSouza identified the following signs and symptoms: anhedonia or pervasive loss of

4    interest in almost all activities; appetite disturbance with weight change; decreased energy;

5    impaired impulse control; generalized persistent anxiety; mood disturbance, difficulty thinking or

6    concentrating; recurrent and intrusive recollections of a traumatic experience which are a source of

7    marked distress; pathological dependence, passivity, or aggressivity; persistent disturbance of

8    mood or affect; paranoid thinking or inappropriate suspiciousness; emotional withdrawal or

9    isolation; bipolar syndrome with a history of episodic periods manifested by the full symptomatic

10   picture of both manic and depressive syndromes; intense and unstable interpersonal relationships

11   and impulsive and damaging behavior; deeply ingrained maladaptive patterns of behavior; easy

12   distractibility; sleep disturbance; and involvement in activities with a high probability of painful

13   consequences which are not recognized.  AR 388.

14        DeSouza assessed, among other things, that Plaintiff had marked impairments in

15   understanding, remembering, and carrying out simple instructions; marked impairments in

16   interacting with others; marked impairments in concentration, persistence, and pace; marked

17   restrictions of activities of daily living; and extreme difficulties in maintaining social functioning.

18   AR 389-90.  She assessed that Plaintiff had experienced one to two episodes of decompensation

19   within a 12-month period, each of at least two-weeks duration.  AR 390.  She estimated that

20   Plaintiff's impairments would interfere with his concentration or pace of work 50% of an average

21   day, and that his impairments would cause him to miss more than four days of work per month.

22   *Id.*

23        **6.    Dr. Hipolito's Treatment Notes**

24        Plaintiff met with Dr. Michael Hipolito, M.D., Schuman-Liles Clinic, four times from

25   August 13, 2015 to November 19, 2015.  *See* AR 356-71.  Plaintiff complained of depression and

26   anxiety.  AR 368.  Dr. Hipolito completed a mental status exam at his first encounter with Plaintiff

27   on August 13.  AR 368-69.  He noted that Plaintiff's appearance and behavior were "within

28   normal limits," and that he appeared neatly and well groomed, and well-nourished.  Plaintiff's

8

speech was mildly pressured, and his mood and affect were depressed and irritable. His thought process was somewhat disorganized, he denied homicidal or suicidal ideations but reported auditory hallucinations. His orientation was within normal limits, as well as his impulse control, insight, and judgment. AR 369. Dr. Hipolito assessed that Plaintiff had no impulse control problems, and that he was not threatening or assaultive. He diagnosed Plaintiff with bipolar disorder, severe most recent episode (or current) mixed, specified with psychotic behavior. He assigned Plaintiff a GAF score of 50. AR 370. He noted that Plaintiff exhibited no acute danger-to-self or danger-to-other risk factors and had "no special needs" at that time. He continued Plaintiff's prescription of Zyprexa and prescribed him Divalproex Sodium[6]. AR 371.

After Dr. Hipolito's three other visits with Plaintiff, he noted that Plaintiff had "mildly pressured" speech, a "somewhat intense" affect, a "somewhat disorganized" thought process, auditory hallucinations, and paranoid ideations. AR 364-65, 360-61, 356-57 (ordered chronologically). After a September 17, 2015 visit, Dr. Hipolito noted that with his medications Plaintiff's mood felt more stable to him, and he was less irritable overall. AR 365. He noted after their October 22, 2015 visit that Plaintiff endorsed feeling stable on his current medications, with no side effects, and that his mood swings were less intense. AR 361. He noted after that visit as well as their final, November 19, 2015, visit that Plaintiff's responses to medication were good, as well as his adherence to medication. AR 361, 357. He further noted on November 19 that Plaintiff was "sleeping and eating okay" and his energy was good. Plaintiff preferred to keep the same medications he was on. Plaintiff was fully oriented, had appearance and behavior within normal limits, and was neatly groomed and well-nourished. Plaintiff's mood was "'fine,'" and his affect was "somewhat intense." His thought process was somewhat disorganized, and he reported auditory hallucinations. AR 357. His impulse control, insight, and judgment were all "within normal limits -good." AR 358.

---

[6] Divalproex sodium can be used to treat manic episodes associated with bipolar disorder. https://www.accessdata.fda.gov/drugsatfda_docs/label/2011/018723s037lbl.pdf (last visited April 20, 2020).

### 7.      Dr. Weber's Treatment Notes

From April 14, 2016 to December 13, 2018, Plaintiff was treated on six occasions by Dr. Armeen Weber, M.D., Schuman-Liles Clinic. *See* AR 549-74. These visits were a continuation of his treatment with Dr. Hipolito. AR 572. Dr. Weber's notes incorporated Dr. Hipolito's treatment plan and assessments, and his April 14, 2016 visit note was largely consistent with Dr. Hipolito's November 19, 2015 note. *See* AR 571-74. Plaintiff reported to Dr. Weber that, "I am feeling better now that I'm back on meds. . . . The meds help with my depression too." He reported that he was "having [a] SSI review." AR 572.

Dr. Weber noted that Plaintiff's appearance and behavior were within normal limits; he was well nourished and groomed; his speech was "pressured (and a bit tangential);" his mood and affect were "not within normal limits – calmer than last visit but still has some ups and downs in his mood[]swings;" his thought process was within normal limits and was "linear, logical, and lucid;" his thought content was not within normal limits, though he was "hearing and seeing things less than when here last;" his memory was "impaired somewhat" according to his own reporting; and his attention, concentration, impulse control, insight, and judgment were all "within normal limits – good." AR 573. Dr. Weber did not modify the GAF score of 50, which Dr. Hipolito assigned. *Id.* Plaintiff asked to return in two months instead of one and was given enough medication to last until his expected return in June 2016. AR 574.

The record reflects that Plaintiff's next appointment with Dr. Weber was on April 12, 2017, almost a year later. Dr. Weber's notes from that date and from May 11, 2017, including mental status assessments, were largely unchanged from the April 2016 notes. AR 563-66. However, on April 12, 2017, he changed Plaintiff's diagnosis to schizoaffective disorder, bipolar type. AR 569.

Plaintiff next saw Dr. Weber approximately 16 months later, on September 7, 2018. Dr. Weber notes from that date and from October 18, 2018 were also largely consistent. AR 559-62, 555-58. Dr. Weber noted on September 7 that Plaintiff was last seen in the spring of 2017, and that he stopped coming to appointments "after he went out of town . . . and couldn't get back." AR 562. Plaintiff reported that he had to return to see Dr. Weber because his primary care

provider told him he had to go and have labs done.  AR 560.

On December 13, 2018, Dr. Weber noted that Plaintiff was "not pressured" and was "hearing less voices and getting less agitated."  AR 553.  Plaintiff reported that he would still get upset and hear voices, though "the problems [were] not as bad as before the meds."  AR 551.  Dr. Weber assessed that Plaintiff's appearance and behavior, thought process, orientation, attention, concentration, impulse control, insight, and judgement were all still within normal limits.  AR 551-52.  Plaintiff had pressured speech.  AR 551.  He reported fewer mood swings, but "lots of anxiety about his SSI hearing."  AR 551-52.  Dr. Weber prescribed Latuda, an antipsychotic.  AR 553.

### 8.   Dr. Parma's Note

Plaintiff saw Dr. Jennifer Parma, M.D., on January 12, 2016.  *See* AR 380-85.  Dr. Parma noted that Plaintiff had heard voices in the past.  She noted that Plaintiff was seeing a psychiatrist and therapist and had a diagnosis of bipolar disorder.  AR 380.  After examining Plaintiff, Dr. Parma noted that he was anxious and had inappropriate mood and affect, auditory hallucinations, flight of ideas, mood swings, obsessive thought, paranoia, and pressured speech.  She noted that Plaintiff had normal orientation, and was oriented to time, place, person and situation.  He had normal insight.  AR 383.

### 9.   Dr. Catlin's Evaluation Report

On January 14, 2019, Dr. Laura Catlin, Psy.D., conducted a psychological evaluation of Plaintiff.  AR 585-95.  After a mental status examination, Dr. Catlin assessed that Plaintiff's level of arousal during the interview was within normal limits, his response time was average and he appeared alert and oriented, and he was engaged in the evaluation and able to sustain his attention.  AR 587.  Plaintiff was adequately groomed and well-dressed, and he had no difficulty maintaining appropriate eye contact.  *Id.*  Plaintiff presented as tense but polite, open, earnest and forthright.  His motor activity was normal in amount.  *Id.*  He had a depressed mood and flat affect.  *Id.*  He reported no suicidal thoughts, plans, or intent.  *Id.*  He reported some auditory hallucinations at night.  *Id.*  His thought process was linear and goal directed, though his thought content evidenced some perseveration on negative thinking and paranoia.  *Id.*  His insight and judgment were limited,

his concentration was very poor, and he evidenced impairments in immediate and delayed memory.  AR 587-88.

Concerning his cognitive functioning, Dr. Catlin noted that Plaintiff's level of conversational proficiency was typical for his age, he was cooperative even when faced with a difficult task, and he was prompt but careful in his responses and appeared to be attentive to the tasks he was working on.  AR 588.  He did, however, seem restless at times and he seemed tense or worried.  *Id.*

Dr. Catlin assessed Plaintiff's intellectual functioning using the Wechsler Adult Intelligence Scale, Fourth Edition ("WASI-4"). AR 597-603.  Plaintiff's full-scale IQ was 72, in the borderline range.  AR 591, 598.  Dr. Catlin administered the RBANS and Plaintiff's overall score was 74, in the borderline range.  AR 588-89.  His score on the Visuospatial/Constructional Index was 56, in the extremely low range; the Immediate Memory Index was 61, in the extremely low range; the Delayed Memory Index was 85, in the low average range; the Language Index was 94, in the normal range; and the Attention Index was 100, in the average range.  AR 588-89.

Dr. Catlin diagnosed Plaintiff with bipolar disorder, most recent episode depressed, moderate.  AR 590.  She found that Plaintiff had overall marked impairment in performing in the workplace.  AR 592.  She found that Plaintiff had extreme impairment in his ability to understand and remember detailed instructions and carry out detailed instructions.  *Id.*  She found that he had marked impairment in his ability to understand and remember short and simple work-like procedures; carry out short and simple instructions; maintain pace and persistence to perform simple tasks; maintain attention for a two-hour segment; maintain regular attendance and be punctual; work with or near others; make simple work-related decisions; complete a normal workday and workweek; maintain pace and persistence to perform detailed tasks; perform at a consistent pace; ask simple questions or request assistance; interact with the general public; adapt to changes in a job routine; withstand the stress of a routine workday; accept instructions and respond to criticism from supervisors; get along with coworkers or peers; interact with supervisors, coworkers, and the public; be aware of normal hazards and take precautions; travel to unfamiliar places; and use public transportation.  AR 592-93.  She found that he would miss more

than four days of work a month.  AR 593.

### 10.   State Agency Consultant Daugherty's Disability Determination

State Agency Consultant Dr. Susan Daugherty, Ph.D., reviewed the record and produced a Disability Determination Explanation on March 24, 2014.  AR 71-82.  She concluded that Plaintiff had mild restrictions in activities of daily living, and moderate difficulties in maintaining social functioning and maintaining concentration, persistence, and pace.  AR 76.  She concluded Plaintiff had no episodes of decompensation of extended duration.  *Id.*  She concluded that Plaintiff could perform work where interpersonal contact was incidental to the work performed and where the complexity of tasks is learned and performed by rote, with few variables and little judgment required, and where supervision is simple, direct, and concrete.  AR 79.  Dr. Daugherty had no contact with Plaintiff.  *Id*.

### 11.   State Agency Consultant Franco's Disability Determination

Stage Agency Consultant Dr. Anna M. Franco, Psy.D., reviewed the record and produced a Disability Determination Explanation on June 9, 2014.  AR 83-97.  She adopted Dr. Daugherty's initial determination.  AR 95.  She also had no contact with Plaintiff.  AR 94.

### III.   SOCIAL SECURITY ADMINISTRATION PROCEEDINGS

On November 15, 2013, Plaintiff filed a claim for supplemental security income ("SSI"), alleging disability beginning on January 1, 2001.  AR 70-72.  On April 7, 2014, the agency denied Plaintiff's claim, finding he did not qualify for payments.  AR 100.  Plaintiff filed a timely request for reconsideration, which was denied on June 10, 2014.  AR 104.  He requested a hearing before an Administrative Law Judge ("ALJ").  On April 5, 2016, he requested to amend his alleged onset date to his application date, November 15, 2013.  AR 265.  ALJ E. Alis conducted a hearing on April 12, 2016.  AR 20.  Plaintiff testified in person at the hearing and was represented by counsel, Amyu Orgain.  *Id.*  The ALJ also heard testimony from Vocational Expert Malcolm J. Brodzinsky. *Id.*  He issued an unfavorable decision on June 27, 2016.  AR 20-29.

On August 25, 2016, Plaintiff filed a timely request for review of the hearing decision, and on July 11, 2017, the Appeals Council denied Plaintiff's request.  AR 161-63, 1-3.  On September 8, 2017, Plaintiff filed a complaint in this District requesting judicial review.  AT 464-65.  On July

United States District Court
Northern District of California

6, 2018, Magistrate Judge Robert M. Illman granted in part Plaintiff's motion for summary judgment, entered judgment in favor of Plaintiff, and remanded the case for further proceedings. AR 474-79.  Judge Illman found that the ALJ erred by failing to address the medical opinion of treating psychiatrist Michael Hipolito, M.D., and that he could not resolve issues raised by Plaintiff until that error was corrected.  AR 478-79.  The Appeals Council issued a remand order on August 24, 2018, vacating the ALJ's decision and remanding for further proceedings consistent with Judge Illman's order.  AR 485.  ALJ Alis held a new hearing on January 25, 2019.  AR 428. On May 30, 2019, he issued a second unfavorable decision.  AR 410-21.

**A.      Plaintiff's Testimony**

      **1.      April 12, 2016 Hearing**

At his April 12, 2016 hearing, Plaintiff testified that he had not worked since 2001, when he was let go from Macy's after two months because he failed to fill disclose something on his application.  AR 40.  He testified that mood swings made him concerned about his ability to work outside the home.  AR 48.  He testified that he did want to work in the past, but that he "just got so frustrated with life" that he "gave it up more or less."  AR 49.  He said that "working and trying to do it on your own at home" frustrated him.  *Id.*

Plaintiff testified that he lived alone, and that he did his own cleaning at home, his own dusting, vacuuming, "moving," and wash.  AR 41, 51.  He testified that doing all of those tasks in one day wore him out, so he tried to stick to one task at a time.  AR 52.

Plaintiff testified that he did not have any friends.  AR 46.  He testified that at that time, he was seeing a psychiatrist, Dr. Weber, once a month, that he had started seeing Dr. Weber in November 2015, and that he missed a couple of sessions at first.  AR 55-56.  Dr. Weber prescribed him medications, which Plaintiff felt helped him.  AR 56.

      **2.      January 25, 2019 Hearing**

Plaintiff testified at the hearing on remand that he'd "gotten better" because of the medication he was on, and that he'd gotten used to the medication, and that the medication was keeping him from having mood swings.  AR 435.  He testified that the medication put him where he "needed to be stable at."  *Id.*  He testified that Dr. Weber recently prescribed him a medication

1    that he was supposed to begin taking to help with his hearing sounds and voices.  AR 436-38.

2          Plaintiff testified that he still lived by himself, and he had no problem stating his address

3    for the ALJ.  AR 438-49.  He testified that no one had to come to his apartment to assist him and

4    nobody had to remind him to take his medications.  AR 439.  He testified that his mother helps

5    him with paperwork, such as paperwork for renewing housing or general assistance.  *Id.*

6          Plaintiff testified that he felt he couldn't work because he had no work skills, and that after

7    not having worked for nearly 20 years, it was not going to work out for him "to have to get used to

8    being out there again, getting in public with people, trying to work around people."  AR 439-40.

9    He testified that he wouldn't be able to follow instructions properly.  AR 440.

10          Plaintiff testified that he had been taking paratransit to get to doctor's appointments, but

11   that he had a standby that "gave up" so his sister began taking him.  AR 443.  He testified that he

12   leaves his home about three times a week, mostly to go to the library around the corner to return

13   books.  AR 445.  He testified that on a typical day he wakes up, takes his medication, has

14   breakfast, reads, eats dinner, and then takes his medication again before bed.  AR 446-47.

15   **B.      Vocational Experts' Testimony**

16          **1.      April 12, 2016 Hearing**

17          Vocational expert Malcolm Brodzinsky testified that in his opinion, a hypothetical

18   individual with Plaintiff's age and education, with no past jobs, and the same RFC as determined

19   by the ALJ, if limited to performing simple, routine and repetitive tasks, making simple work-

20   related decisions, and needing to work in an environment that is very stable, with no public

21   contact and only occasional contact with supervisors and co-workers, and with no tandem or group

22   work, would be able to do work as a hand packager (DOT 920.587-018), dishwasher/kitchen

23   helper (DOT 318.687-010), and mail clerk (DOT 209.687-026).  AR 63-66.  He testified that there

24   were 328,000 of those jobs in the national economy.

25          **2.      January 25, 2019 Hearing**

26          Vocational expert Lorian I. Hyatt testified that an individual of claimant's age and

27   education, with no past work experience, who could perform work across all exertional levels, but

28   would be limited to simple and routine tasks and simple work-related decisions, who could not

United States District Court
Northern District of California

perform work at a production rate, who would need to work in a stable work environment and be limited to occasional, incidental interactions with coworkers with no work in a tandem or group setting, and who could not do work requiring interaction with the public, could perform work as a warehouse worker (DOT 922.687-058), cleaner (DOT 361.685-018), laundry worker (DOT 361.685-018), and vine pruner (DOT 403.687-022).  AR 451-52.  Hyatt testified that there were approximately 1,400,000 of those jobs in the national economy, with that number reduced by 50% due to the various restrictions in the hypothetical.  AR 452.

**C.      The ALJ's Decision and Plaintiff's Appeal**

On May 30, 2019, the ALJ issued an unfavorable decision finding Plaintiff was not disabled.  AR 410-21.  Plaintiff commenced this action for judicial review on August 22, 2019. On January 21, 2020, he filed the present Motion for Summary Judgment.  On March 17, 2020, Defendant filed his Cross-Motion.

# IV.   STANDARD OF REVIEW

This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42 U.S.C. § 405(g).  An ALJ's decision to deny benefits must be set aside only when it is "based on legal error or not supported by substantial evidence in the record."  *Trevizo v. Berryhill*, 871 F.3d 664, 674 (9th Cir. 2017) (citation and quotation marks omitted).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation and quotation marks omitted).  It requires "more than a mere scintilla" but "less than a preponderance" of the evidence.  *Id.*; *Trevizo*, 871 F.3d at 674.

The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence."  *Trevizo*, 871 F.3d at 675 (citation and quotation marks omitted).  However, "[w]here evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld."  *Id.* (citation and quotation marks omitted).  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."  *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014)

United States District Court
Northern District of California

(citation and quotation marks omitted).

Additionally, the harmless error rule applies where substantial evidence otherwise supports the ALJ's decision. *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). "[A]n error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error does not negate the validity of the ALJ's ultimate conclusion." *Id.* (citation and quotation marks omitted). A court may not reverse an ALJ's decision because of a harmless error. *Id.* at 1111 (citation omitted). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Id.* (citation and quotation marks omitted).

## V.   DISCUSSION

### A.   The ALJ's Decision

A claimant is considered "disabled" under the Social Security Act if two requirements are met. *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). First, the claimant must demonstrate "an inability to engage in any substantial gainful activity [("SGA")] by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Second, the impairment or impairments must be severe enough that the claimant is unable to perform previous work and cannot, based on age, education, and work experience "engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

The regulations promulgated by the Commissioner of Social Security provide for a five-step sequential analysis to determine whether a Social Security claimant is disabled.[7] 20 C.F.R. § 404.1520. The sequential inquiry is terminated when "a question is answered affirmatively or negatively in such a way that a decision can be made that a claimant is or is not disabled." *Pitzer v. Sullivan*, 908 F.2d 502, 504 (9th Cir. 1990). During the first four steps of this sequential inquiry, the claimant bears the burden of proof to demonstrate disability. *Valentine v. Comm'r*

---

[7] Disability is "the inability to engage in any substantial gainful activity" because of a medical impairment which can result in death or "which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

United States District Court
Northern District of California

1    *Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009).  At step five, the burden shifts to the

2    Commissioner "to show that the claimant can do other kinds of work."  *Id.* (quoting *Embrey v.*

3    *Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)).

4         The ALJ must first determine whether the claimant is performing SGA, which would

5    mandate that the claimant be found not disabled regardless of medical condition, age, education,

6    and work experience.  20 C.F.R. § 404.1520(a)(4)(i), (b).  Here, the ALJ determined Plaintiff had

7    not performed SGA since November 15, 2013, his amended alleged onset date.  AR 412.

8         At step two, the ALJ must determine, based on medical findings, whether the claimant has

9    a "severe" impairment or combination of impairments as defined by the Social Security Act.  20

10   C.F.R. § 404.1520(a)(4)(ii).  If no severe impairment is found, the claimant is not disabled.  *Id.* §

11   404.1520(c).  Here, the ALJ determined Plaintiff had the following severe impairments: major

12   depressive disorder with psychotic features; obsessive-compulsive disorder; anti-social personality

13   traits; borderline intellectual functioning; and bipolar disorder.  AR 412.

14        If the ALJ determines that the claimant has a severe impairment, the process proceeds to

15   the third step, where the ALJ must determine whether the claimant has an impairment or

16   combination of impairments that meet or equals an impairment listed in 20 C.F.R. Part 404, Subpt.

17   P, App. 1 (the "Listings").  20 C.F.R. § 404.1520(a)(4)(iii).  If a claimant's impairment either

18   meets the listed criteria for the diagnosis or is medically equivalent to the criteria of the diagnosis,

19   he is conclusively presumed to be disabled, without considering age, education and work

20   experience.  *Id.* § 404.1520(d).  Here, the ALJ determined Plaintiff did not have an impairment or

21   combination of impairments that met the listings.  AR 413.

22        Before proceeding to step four, the ALJ must determine the claimant's Residual Function

23   Capacity ("RFC").  20 C.F.R. § 404.1520(e).  RFC refers to what an individual can do in a work

24   setting, despite mental or physical limitations caused by impairments or related symptoms.  *Id.* §

25   404.1545(a)(1).  In assessing an individual's RFC, the ALJ must consider all the claimant's

26   medically determinable impairments, including the medically determinable impairments that are

27   non-severe.  *Id.* § 404.1545(e).

28        In the RFC assessment, the ALJ assesses the claimant's physical and mental abilities, as

United States District Court
Northern District of California

1    well as other abilities affected by the claimant's impairments. *Id.* §§ 404.1545(b)-(d), 416.945(b)-

2    (d). With respect to a claimant's physical abilities, "[a] limited ability to perform certain physical

3    demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or

4    other physical functions (including manipulative or postural functions, such as reaching, handling,

5    stooping or crouching), may reduce [the claimant's] ability to do past work and other work." *Id.*

6    §§ 404.1545(b), 416.945(b). With respect to a claimant's mental abilities, "[a] limited ability to

7    carry out certain mental activities, such as limitations in understanding, remembering, and

8    carrying out instructions, and in responding appropriately to supervision, coworkers, and work

9    pressures in a work setting, may reduce [the claimant's] ability to do past work and other work."

10   *Id.* §§ 404.1545(c), 416.945(c). Additionally, "[s]ome medically determinable impairment(s),

11   such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and

12   impairment(s) which impose environmental restrictions, may cause limitations and restrictions

13   which affect other work-related abilities." *Id.* §§ 404.1545(d), 416.945(d).

14         Here, the ALJ determined Plaintiff had the RFC to perform a full range of work at all

15   exertional levels except that he could not perform work at a production rate. AR 414. He found

16   Plaintiff was limited to simple, routine, repetitive tasks, simple work-related decision, and a stable

17   work environment, i.e., few variables in terms of day-to-day work setting and processes used to

18   accomplish tasks. *Id.* He found Plaintiff could tolerate occasional interaction with coworkers and

19   no interaction with the public, that Plaintiff could not perform tandem, team, or group work, and

20   that interactions with coworkers could at most be incidental to work. *Id.*

21         The fourth step of the evaluation process requires that the ALJ determine whether the

22   claimant's RFC is sufficient to perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv);

23   404.1520(f). Past relevant work is work performed within the past 15 years that was substantial

24   gainful activity, and that lasted long enough for the claimant to learn to do it. *Id.* §

25   404.1560(b)(1). If the claimant has the RFC to do his past relevant work, the claimant is not

26   disabled. *Id.* § 404.1520(a)(4)(iv). Here, the ALJ found that Plaintiff had no past relevant work.

27   AR 419.

28         In the fifth step of the analysis, the burden shifts to the Commissioner to prove that there

United States District Court
Northern District of California

are jobs existing in significant numbers in the national economy which the claimant can perform consistent with the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g); 404.1560(c). The Commissioner can meet this burden by relying on the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines at 20 C.F.R. Part 404, Subpt. P, App. 2 (the "Guidelines"). *Lounsbury v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006).[8] Here, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. AR 419. The ALJ found that Plaintiff had not been under a disability since the date of his application, November 15, 2013. AR 420.

## B.  Analysis

Plaintiff argues that the ALJ erred in how he evaluated medical opinions, improperly assigning too much weight to some experts' opinions and too little to others'; by finding Plaintiff's testimony inconsistent with the record without explaining why; by finding that Plaintiff's impairments didn't meet or equal a listing; in determining Plaintiff's RFC; by failing to fully develop the record; and by failing to consider the special adverse profile for no work experience.

Defendant moves for the Court to reverse and remand the ALJ's decision, arguing that further proceedings are necessary to determine whether Plaintiff was in fact disabled. Defendant also argues that remand is necessary "to allow the ALJ to consider the fact that Plaintiff was only one month away from changing age categories at the time of the decision." Def.'s Mot. at 5.

### 1.  The ALJ's Evaluation of Medical Opinions

When determining whether a claimant is disabled, the ALJ must consider each medical opinion in the record together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *King v. Berryhill*, 2018 WL 4586726, at *11 (N.D. Cal. Sept. 25, 2018). In deciding how much weight to give to any medical opinion, the ALJ considers the extent to which the medical source presents relevant evidence to support the opinion. 20 C.F.R. § 416.927(c)(3). Generally, more weight will be given to an opinion that is supported by medical signs and laboratory findings, and the degree to which the opinion provides supporting explanations and is consistent with the record as a

_____

[8] The Medical-Vocational Guidelines are commonly known as "the grids." *Lounsbury*, 468 F.3d at 1114.

United States District Court
Northern District of California

1    whole.  *Id.* § 416.927(c)(3)-(4).  The better an explanation a source provides for a medical opinion,

2    the more weight will be given.  *Id.* § 416.927(c)(3).

3           Additionally, the Ninth Circuit has "developed standards that guide [the] analysis of an

4    ALJ's weighing of medical evidence."  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th

5    Cir. 2008) (citing 20 C.F.R. § 404.1527).  Courts "distinguish among the opinions of three types

6    of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do

7    not treat the claimant (examining physicians); and (3) those who neither examine nor treat the

8    claimant (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  "By

9    rule, the Social Security Administration favors the opinion of a treating physician over non-

10   treating physicians."  *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. §

11   404.1527).  If a claimant has a treatment relationship with a provider, and clinical evidence

12   supports that provider's opinion and is consistent with the record, the provider will be given

13   controlling weight.  20 C.F.R. § 416.927(c)(2).  "The opinion of a treating physician is given

14   deference because 'he is employed to cure and has a greater opportunity to know and observe the

15   patient as an individual.'"  *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999)

16   (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).  "When evidence in the record

17   contradicts the opinion of a treating physician, the ALJ must present 'specific and legitimate

18   reasons' for discounting the treating physician's opinion, supported by substantial evidence."

19   *Bray v. Comm'r of SSA*, 554 F.3d 1219, 1228 (9th Cir. 2009) (citation omitted).  "However, the

20   ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is

21   brief, conclusory and inadequately supported by clinical findings."  *Id.* at 1228 (quotation and

22   citation omitted).

23          Here, Plaintiff argues that the ALJ rejecting the opinion of treating therapist DeSouza;

24   implicitly giving significant weight to the opinion of treating therapist Sondecker without

25   explaining why; rejecting the GAF scores assessed by Drs. Hipolito and Weber; rejecting the

26   opinion of examining source Dr. Walser; rejecting the opinion of examining source Dr. Catlin;

27   rejecting the GAF score assessed by examining source Dr. Van Gaasbeek; and giving great weight

28   to the opinions of non-treating, non-examining consultants Drs. Daugherty and Franco.  Pl.'s Mot.

at 8-9.  The Court will address each opinion in turn.

### a.  DeSouza's Opinion

Plaintiff argues that the ALJ erred by rejecting the opinion of treating therapist DeSouza. DeSouza opined that Plaintiff had marked or extreme limitations across most areas of mental and social functioning.  AR 389-90.  The ALJ noted that DeSouza was not an acceptable medical source but considered her opinion as to the severity of Plaintiff's impairments.  AR 418.  He rejected DeSouza's opinion and gave specific reasons for doing so.  He wrote that he was unpersuaded by DeSouza's assessment "because the 2014 progress notes indicated minimal status abnormalities and subsequent treatment notes from acceptable medical sources indicated improvement with prescribed treatment with no evidence of significant abnormal clinical findings."  *Id.*  He also opined that DeSouza's treatment notes "generally discuss obtaining disability benefits, finances, substance abuse, family relations and employment issues but show little in the way of clinical findings."  AR 416.

The majority of progress notes from 2014 were those from therapist Sondecker.  Plaintiff argues that, contrary to the ALJ's finding, these notes did indicate "significant mental status abnormalities."  Pl.'s Mot. at 10.  In particular, Plaintiff points out that on October 15, 2013, Sondecker noted that Plaintiff's psychomotor behaviors were restless and that he had flat affect, anxious and depressed mood, discouraged attitude, poor insight, abasing self-perception, circumstantial though process, and auditory hallucinations.  Plaintiff points out that on January 7, February 13, and May 15, 2014, Sondecker indicated "no change" in Plaintiff's mental status.  Thus, Plaintiff argues that Sondecker's 2014 notes indicated the same significant abnormalities as the October 2013 note.  But Plaintiff has cherry-picked from the record.  In October 2013 Sondecker also noted that Plaintiff's appearance was normal; he was oriented to person, place, time and situation; his behavior was unremarkable; his speech was appropriate; his memory was intact; he had clear consciousness; his intellect was average; and his reasoning, impulse control, and judgment were fair.  And as the ALJ noted, AR 415, Sondecker opined on January 7, 2014 that Plaintiff was not a candidate for psychotherapy and was satisfied with his current lifestyle, and that his presentation suggested secondary gains.  He opined on February 13, 2014 that

22

1    Plaintiff did not need group therapy.  And on May 15, 2014 he assessed that Plaintiff was stable

2    and not a candidate for psychotherapy.

3            Also, a review of DeSouza's treatment notes backs up the ALJ's characterization of them.

4    As the ALJ wrote, on several occasions the notes discussed disability benefits or financial

5    assistance.  *See, e.g.*, AR 393 (Jan. 21, 2015; Jan. 28, 2015), AR 394 (Feb. 18, 2015), AR 395

6    (Mar. 11, 2015), AR 397 (May 13, 2015), AR 400 (Aug. 19, 2015).  They often discussed Plaintiff

7    feeling upset or emotional about his mother's health or his grief of his brother's death, but noted

8    no manic episodes, periods of decompensation, depressive episodes, or disruptions to daily life.

9    *See, e.g.*, AR 398 (June 24, 2015); AR 401 (Nov. 11, 2015; Nov. 18, 2015); AR 403 (Sept. 16,

10   2015).  The notes discussed little in the way of clinical findings.  DeSouza consistently noted that

11   Plaintiff's appearance was good and his behavior was unproblematic.  *See, e.g.*, AR 394 (Feb. 11,

12   2015, "Appearance good, calm."); AR 395 (Mar. 25, 2015, "Appearance: clean clothes &

13   hygiene."); AR 400 (Aug. 19, 2015, "Beh. calm and fair appearance."); AR 403 (Sept. 30, 2015,

14   "Good & good appearance. . . . [W]as very energetic & animated in [treatment] today."); AR 401

15   (Nov. 18, 2015, "Good appearance."); AR 404 (Feb. 17, 2016, "Good appearance and calm

16   behavior."); *but see, e.g.*, AR 398 (June 10, 2015, "OK appearance and anxious beh.").  And

17   DeSouza consistently alluded to only a vague treatment goal of setting up or keeping boundaries.

18   *See, e.g.*, AR 393 (Jan. 28, 2015); AR 394 (Feb. 11, 2015); AR 396 (Apr. 8, 2015); AR 397 (May

19   13, 2015); AR 398 (July 1, 2015); AR 400 (Aug. 19, 2015); AR 401 (Oct. 21, 2015); AR 402

20   (Dec. 19, 2015); AR 404 (Jan. 20, 2016; Feb. 3, 2016).  Furthermore, Plaintiff missed nearly half

21   of his sessions over the duration of treatment with DeSouza, including multiple no-shows, and

22   DeSouza had to discuss Plaintiff's lack of attendance with him.  *See, e.g.*, AR 393 (Jan. 7, 2014;

23   Jan. 14, 2015; Feb. 4, 2015); AR 395 (Mar. 4, 2015; Apr. 1, 2015); AR 396 (Apr. 15, 2015; Apr.

24   22, 2015); AR 397 (May 6, 2015; May 20, 2015; May 27, 2015; June 3, 2015); AR 398 (June 10,

25   2015, "discussed his lack of attendance"; June 17, 2015); AR 399 (July 15, 2015; Aug. 8, 2015;

26   Aug. 8, 2015); AR 400 (Sept. 9, 2015); AR 403 (Oct. 7, 2015); AR 401 (Nov. 4, 2015); AR 402

27   (Dec. 2, 2015; Jan. 6, 2016); AR 404 (Jan. 27, 2016; Feb. 10, 2016); AR 405 (Feb. 24, 2016; Mar.

28   2, 2016; Mar. 16, 2016; Mar. 23, 2016).  Noncompliance with treatment is a factor in the

United States District Court
Northern District of California

23

United States District Court
Northern District of California

1    determination of disability status.  *See* 20 C.F.R. § 416.930 ("If you do not follow the prescribed

2    treatment without a good reason, we will not find you disabled . . . if you are already receiving

3    benefits, we will stop paying you benefits."); SSR 16-3P (Mar. 16, 2016), 2016 WL 1119029, at

4    *8 ("[I]f the frequency or extent of the treatment sought by an individual is not comparable with

5    the degree of the individual's subjective complaints, or if the individual fails to follow prescribed

6    treatment that might improve symptoms, we may find the alleged intensity and persistence of an

7    individual's symptoms are inconsistent with the overall evidence of record.").

8         Plaintiff points to only two specific entries in DeSouza treatment notes.  On October 21,

9    2015, Plaintiff reported that he lost his temper and broke his friend's phone, because he "was

10   angry [because] his friend was answering calls, instead of hanging out [with] him."  AR 401.

11   Plaintiff references this entry but doesn't say anything about it.  *See* Pl.'s Mot. at 13.  On the other

12   hand, DeSouza consistently noted that Plaintiff appeared "good" and "calm."  Her notes never

13   discussed issues with anger or impulsive behavior[9] and never indicated treatment goals directed at

14   those issues, and DeSouza didn't indicate anger or impulsive behavior under her clinical findings

15   in her mental impairment questionnaire.  *See* AR 387.  Plaintiff's other reference is a February 11,

16   2015 note that states that Plaintiff "still asks his mom for help [with] some of his errands."  But

17   contrary to Plaintiff's assertion, that fact alone, even if not contradicted by other evidence, does

18   not support an inference that Plaintiff could not perform activities of daily living on his own.  It's

19   not uncommon for people to ask for help running errands.

20        Plaintiff argues that the ALJ failed to properly consider the factors in Social Security

21   Ruling 06-03P in evaluating DeSouza's opinion.  Those factors which are relevant here are: the

22   treatment relationship between the individual and the treating source, including its length, nature,

23   and extent as well as frequency of examination, and how consistent the medical opinion is with the

24   record as a whole.  SSR 06-03P (Aug. 9, 2006), 2006 WL 2329939; *see also* 20 C.F.R. §

25   404.1527(c) (factors include length, nature, and extent of relationship, degree to which medical

26

27   ───────────────
     [9] Only DeSouza's note from the first session mentioned "anger issues," and even then, it seems
28   Plaintiff was self-reporting.  AR 392.  Nowhere do DeSouza's notes reflect her impressions of any
     anger issues.

1    source presents relevant evidence to support her opinion, and consistency with the record as a

2    whole).  The ALJ explicitly noted the length of DeSouza's treatment relationship with Plaintiff

3    and found that her notes showed "little in the way of clinical findings" (i.e., support for her

4    opinion).  AR 416.  He found her opinion was not consistent with the record as a whole.  AR 418.

5    "The [ALJ] was not required to specifically reference each factor listed in 20 C.F.R. § 404.1527(c)

6    [and SSR 06-03P]."  *Harris v. Colvin*, 584 Fed. Appx. 526, 527 (9th Cir. 2014).  The argument

7    that the ALJ didn't properly consider relevant factors in weighing DeSouza's opinion is without

8    merit.

9            Lastly, subsequent treatment notes from acceptable medical sources do support the ALJ's

10   decision to discount DeSouza's opinion.  The ALJ found that subsequent treatment notes indicated

11   improvement with prescribed treatment and no evidence of significant abnormal clinical findings.

12   Plaintiff argues that this finding is contradicted by the record.  He argues that he "exhibited an

13   abnormal mental status at all his treatment visits in 2015 with Dr. Hipolito, with pressured speech;

14   a somewhat intense mood and affect; a somewhat disorganized thought process; auditory

15   hallucinations; and paranoid ideation."  Pl.'s Mot. at 11 (citing AR 357, 361, 365, 369).  But the

16   question isn't merely if Plaintiff had an impairment, or even a severe one; it's whether he suffered

17   from marked or extreme mental limitations, or a "serious and persistent mental disorder."  And

18   while Dr. Hipolito's notes indicated the abnormalities which Plaintiff recites, he also noted on

19   August 13, 2015 that Plaintiff's appearance and behavior were "within normal limits," he

20   appeared neatly groomed and well-nourished, and his orientation, impulse control, insight, and

21   judgment were all within normal limits.  He opined that Plaintiff had no impulse control problem

22   and was not threatening or assaultive.  He noted that Plaintiff exhibited no acute danger-to-self or

23   danger-to-other risk factors and had no special needs.  He noted on September 17, 2015 that on

24   medication Plaintiff's mood was more stable and he was less irritable overall.  He noted on

25   October 22, 2015 that Plaintiff endorsed feeling stable on his medications, experienced no side

26   effects, and had less intense mood swings.  He noted then and on November 19, 2015 that

27   Plaintiff's responses and adherence to medication were good.  He further noted on November 19

28   that Plaintiff was "sleeping and eating fine" and his energy was good.  Plaintiff was fully oriented,

United States District Court
Northern District of California

25

1    had appearance and behavior within normal limits, and was neatly groomed and well-nourished.

2    Plaintiff's mood was "'fine,'" and his impulse control, insight, and judgment were all "within

3    normal limits -good."

4          Plaintiff also argues that Dr. Weber's progress notes "similarly noted an abnormal mental

5    status at every single appointment," including "abnormal mood and effect, thought content,

6    speech, and memory."  Pl's Mot. at 11 (citing AR 573).  Again, the question isn't whether Plaintiff

7    had an impairment, but whether his impairment or impairments were severe or persistent.  As

8    noted earlier, Plaintiff's visits with Dr. Weber were a continuation of his treatment with Dr.

9    Hipolito.  On April 14, 2016, Plaintiff reported that he was "feeling better now" "back on meds."

10   Although Dr. Weber indicated the abnormalities which Plaintiff recites, he noted that Plaintiff's

11   appearance and behavior were within normal limits; he was well nourished and groomed, his

12   thought process normal and was "linear, logical, and lucid," and his attention, concentration,

13   impulse control, insight, and judgment were all "within normal limits – good."  And Plaintiff's

14   memory impairment was self-reported.  AR 573, 557, 568, 564, 561.  In spring 2017 Plaintiff

15   stopped seeing Dr. Weber (or any treating professional) for nearly 16 months.[10]  After returning in

16   September 2018 he told Dr. Weber that he stopped attending because he went out of town and

17   "couldn't get back."  He reported that he had to return because his primary care provider told him

18   he had to go and have labs done.  Dr. Weber noted that he was "not pressured" and was hearing

19   voices less and getting less agitated.  Plaintiff reported that he would still get upset and hear

20   voices, but that he was taking his medications and those problems were "not as bad as before the

21   meds."  At that time, Dr. Weber assessed that Plaintiff's appearance and behavior, thought

22   process, orientation, attention, concentration, impulse control, insight, and judgement were all

23   within normal limits.  Plaintiff reported "lots of anxiety about his SSI hearing" but fewer mood

24   swings.

25          In sum, substantial evidence supports the ALJ's reasoning for rejecting DeSouza's opinion

26

27   _____

28   [10] Plaintiff saw no treating professional from May 11, 2017 to September 7, 2018.  He started
     seeing Dr. Weber again about two weeks after the Appeals Council issued notice of its order
     remanding his case to an administrative law judge.

United States District Court
Northern District of California

as to the severity of Plaintiff's impairments.  He did not err in doing so.  *See Harris*, 584 Fed.

Appx. at 527 ("The agency articulated 'specific and legitimate reasons' for discounting the

opinion of [the doctor], which was contradicted by three other doctors and not supported by any

clinical findings or diagnostic testing."); *Schow v. Astrue*, 272 Fed. Appx. 647, 651 (9th Cir. 2008)

("[T]he ALJ adequately explained his reasons for giving 'little weight' to the opinion of [] a nurse

practitioner. . . . The ALJ stated that [the nurse] was not an 'acceptable medical source' and cited

inconsistencies between her opinion and the medical record.").

### b.    Sondecker's Opinion and Dr. Walser's Opinion

Plaintiff argues that the ALJ erred by implicitly giving great weight to the opinion of

therapist Sondecker.  Pl.'s Mot. at 12-13.  He points out that the ALJ cited Sondecker's treatment

records in discussing why he gave little weight to the April 14, 2014 opinion of Dr. Walser.  *See*

AR 418.  He argues that the ALJ failed to explain why he felt Sondecker's opinion merited greater

weight than Dr. Walser's and failed to consider any of the factors in SSR 06-03P to determine the

weight merited by Sondecker's opinion.  Tied in with these arguments is Plaintiff's contention that

the ALJ improperly rejected Dr. Walser's opinion that Plaintiff suffered from extreme impairment

in several aptitudes needed to do unskilled work.  AR 349.

"When an [ALJ] determines that an opinion from [a non-acceptable medical] source is

entitled to greater weight than a medical opinion from a *treating* source, the [ALJ] must explain

the reasons in the notice of decision in hearing cases and in the notice of determination . . . ."  SSR

06-03P (emphasis added); 20 C.F.R. § 416.927(f)(2) (identical language).  Also, when a treating

source's opinion is not given controlling weight, "it is weighted according to factors such as the

length of the treatment relationship and the frequency of examination, the nature and extent of the

treatment relationship, supportability, consistency with the record, and specialization of the

physician."  *Trevizo*, 871 F.3d at 675 (citing 20 C.F.R. § 404.1527(c)(2)-(6)).  But Dr. Walser was

not a treating source.  The ALJ noted that Dr. Walser's opinion resulted from a "representative-

procured psychological evaluation."  AR 416.  "Where an examining source's opinion is

contradicted, it may be rejected for specific and legitimate reasons that are supported by

substantial evidence in the record."  *Carmickle v. Comm'r, SSA*, 533 F.3d 1155, 1164 (9th Cir.

United States District Court
Northern District of California

2008) (citation and internal quotation marks omitted).  An ALJ "need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings."  *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) (citation omitted).

The ALJ gave a specific and legitimate reason for not accepting Dr. Walser's opinion: contemporaneous treatment records didn't support her conclusions.  The ALJ referenced Sondecker's assessments that Plaintiff was not a candidate for group therapy or psychotherapy, and Dr. Hipolito and Dr. Weber's findings that Plaintiff's condition had improved with prescribed medication.  *See* AR 417, 418.  Plaintiff contends that Sondecker's records indicated significant impairments in social functioning and marginal adjustment.  He points to Sondecker's finding on February 13, 2014 that Plaintiff was "highly dependent" on his mother, and his comment that Plaintiff's "functional level may be more compromised than I found in initial evaluation . . . ."  *See* AR 312.  Yet on that same date, Sondecker also assessed that Plaintiff had only moderate Axis IV problems, and he kept Plaintiff's GAF score at 70 ("Some mild symptoms . . .  or some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well . . . .").[11] Plaintiff also asserts that Sondecker determined he didn't need group therapy because he said he was not interested.  But that's not what the treatment notes reflect.  Sondecker wrote, "I do not feel he needs group [therapy] and he is not interested in change with his social isolation."  And it was three months later, on May 15, in his final treatment note, that Sondecker assessed that Plaintiff was "stable and not a candidate for psychotherapy."

Responding to the ALJ's reliance on Dr. Hipolito and Dr. Weber's findings, Plaintiff quotes *Parker v. Saul*, 2019 WL 4478234, at *24 (N.D. Cal. Sept. 18, 2019), where the court wrote that, "reliance on isolated treatment notes to conclude that [the claimant] 'improved with treatment' does not constitute a 'specific, legitimate reason' supported by substantial evidence in the record for rejecting" a treating source's opinions with respect to a claimants limitations.  But

---

[11] Sondecker's notes also suggest he might have been referring to financial dependency.  He wrote, "[claimant] is highly dependent on mother and when I asked how he will manage his finances as she pays his bills he became tearful and did not verbalize plan."  AR 312.

that case was different for at least two reasons.  Most importantly, the opinion the ALJ rejected came from a treating source who had met with the plaintiff each week for an hour over several months.  *Id.* at *8-11.  And in that case, the court found that the ALJ had ignored treatment notes by the treating source in deciding to reject her opinion.  *Id.* at *24.  Here, the ALJ correctly determined that months of notes by treating sources didn't support the marked and extreme limitations assessed by an examining source after one visit.

Lastly, although Plaintiff doesn't discuss it in his motion for summary judgment, in his statement of the record, he cites several low scores Dr. Walser gave him after administering the RBANS, and the total score she gave of 78, in the borderline range.  But the Court notes that Dr. Walser herself noted that because of variability within and between Plaintiff's scores on that test (he scored above average on the attention index task), his overall score "should be interpreted with caution."

The ALJ did not err in relying on Sondeckor's findings when rejecting Dr. Walser's opinion, and substantial evidence supported the reasons he gave for doing so.

### c.    Dr. Catlin's Opinion

Plaintiff argues that the ALJ erred in giving little weight to the opinion of examining psychologist Dr. Catlin.  AR 419.  The ALJ noted that Dr. Catlin's evaluation was another "representative-procured psychological evaluation."  AR 417.  He found that "Dr. Catlin's assessment and opinion is similar to that of [Dr. Walser].  [Her] findings are not consistent with the overall medical evidence of record, specifically, the evidence from the claimant's treatment psychiatrist, therapist, and social worker, which indicates no more than moderate limitations with improvement with prescribed treatment."  AR 419; *see also* AR 417 ("Dr. Catlin's evaluation is inconsistent with three years of treatment notes from Dr. Weber, which indicated improvement with adherence to treatment.").  Plaintiff argues that the ALJ's decision was internally inconsistent because earlier he "rejected the opinion of the treating psychiatrists and therapists, who found more than moderate limitations."  Plaintiff doesn't cite any particular findings that the ALJ rejected (he only cites a page of the decision), but presumably he is talking about the ALJ's rejection of DeSouza's opinion.  As discussed above, however, the ALJ stated a legitimate reason

29

1   for rejecting DeSouza's assessment of marked and extreme impairments, and part of that rejection

2   was based on a perceived inconsistency with DeSouza's own treatment notes.  The ALJ did not err

3   in discounting the opinion of Dr. Catlin.  He provided specific reasons for doing so, and

4   substantial evidence supports his reasoning.

5              d.       Dr. Van Gaasbeek's GAF Score

6          Plaintiff argues that the ALJ erred by giving great weight to Dr. Van Gaasbeek's March 7,

7   2014 opinion that Plaintiff had mild to moderate impairments but rejecting the GAF score of 50

8   which Dr. Van Gaasbeek assigned to Plaintiff.  Pl.'s Mot. at 16-17.  The ALJ found that Dr. Van

9   Gaasbeek's opinion about the severity of Plaintiff's impairments was "consistent with the

10  underlying treatment record, prior to March 2014, showing sparse mental health visits and

11  improvement of symptoms with Zyprexa."  AR 418.  He also noted that Dr. Hipolito and Dr.

12  Weber's subsequent treatment notes indicated improvement.  But he rejected Dr. Van Gaasbeek's

13  GAF score of 50, "because Dr. [Van] Gaasbeek's findings and opinion suggest that the severity of

14  claimant's mental impairment is moderate at most."  "Moreover," the ALJ noted, "claimant

15  testified at his most recent hearing that his medications help him sleep through the night, that he

16  has no mood swings, and is able to interact with his mother.  He also is able to live alone and

17  leaves his house three times a week to go to the public library."  AR 418.

18         Plaintiff argues that Dr. Van Gaasbeek's findings are consistent with greater than moderate

19  impairment.  He points to Dr. Van Gaasbeek's assessments after a mental status exam that

20  Plaintiff's grooming was marginal, some of his mental activity or speech tendencies were

21  tangential, he was not always easily redirected, he had difficulty with calculations, and his recent

22  memory was poor.  However, Dr. Van Gaasbeek also noted that Plaintiff's persistence and pace

23  were adequate, his concentration was good, he was polite and cooperative and had "no unusual

24  behaviors," his thought content was appropriate, and his affect was calm.  He estimated that

25  Plaintiff's baseline intellectual functioning to be in the low-average range, and assessed that

26  Plaintiff was "alert and oriented in all spheres, time, person, place and purpose," and his

27  immediate recall and past memory were good.  Plaintiff's fund of knowledge was fair, his abstract

28  thinking fair, and his judgment adequate.  These assessments are more consistent with only mild

or moderate impairments.  And it was ultimately Dr. Van Gaasbeek, not the ALJ, who assessed that Plaintiff had mild or moderate impairments in all areas.  The ALJ had discretion to give more weight to those assessments than the GAF score Dr. Van Gaasbeek assigned.  *See Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) ("The ALJ is [] responsible for resolving ambiguities."); *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985) ("Where the evidence as a whole can support either outcome, we may not substitute our judgment for the ALJ's."); *Cha Thao Moua v. Comm'r of Soc. Sec.*, 2018 WL 5848889, at *2 (E.D. Cal. Nov. 6, 2018) ("The ALJ properly summarized the findings of the doctors, including observations and tests not consistent with their conclusions, and provided specific and legitimate reasons for assigning the weight he did.").

The ALJ gave specific reasons for rejecting Dr. Van Gaasbeek's GAF score, and those reasons are supported by substantial evidence.

### e.    Dr. Hipolito and Dr. Weber's GAF Score

Plaintiff argues that the ALJ erred by rejecting the GAF score assigned by Drs. Weber and Hipolito, who both consistently assigned the same GAF score of 50, a score which indicates "serious symptoms" or a "serious impairment in social, occupational, or school functioning."  The ALJ explained that he gave little weight to these assessments because they were "not consistent with the overall medical evidence of record, including their treatment notes, which indicates with prescribed treatment (sic) and evidence of no more than moderate impairments during the relevant period."  AR 418-19.  Plaintiff argues that the ALJ failed to specify what evidence was inconsistent with a score of 50 or why it was inconsistent.  But the ALJ specified that Dr. Hipolito and Dr. Weber's own treatment notes were inconsistent with that score, and that those notes indicated "evidence of no more than moderate impairments."  Earlier in the decision, the ALJ noted that mental status exams by Dr. Hipolito indicated only "mildly pressured speech, fine mood, somewhat intense effect, somewhat disorganized thought process, and normal impulse control, insight, and judgment," that during Plaintiff's treatment course with Dr. Hipolito he "reported improvement with medication," and that Dr. Hipolito noted in a November 2015 treatment note that Plaintiff was "having a good response to his medication."  AR 417 (citations omitted).  The ALJ also noted that Dr. Weber's treatment notes through December 2018 showed

"largely normal mental status exam findings," and that Plaintiff "continued to able to live alone and that his symptoms were improved with the medications." *Id.* (citations omitted).  This is consistent with the record.  For example, on December 13, 2018, Dr. Weber noted that Plaintiff's appearance and behavior, thought process, orientation, attention, concentration, impulse control, insight, and judgement were all within normal limits.  To the extent there were inconsistencies or ambiguities in the record (i.e. between Dr. Hipolito and Dr. Weber's GAF scores and their own treatment notes), the ALJ was responsible for resolving them, and the evidence here supported the ALJ's decision to discount the GAF score based on Dr. Hipolito and Dr. Weber's treatment notes.

### f.    Dr. Daugherty and Dr. Franco's Opinions

Plaintiff argues that the ALJ erred by giving great weight to the opinions of non-examining consultants Dr. Daugherty and Dr. Franco.  "The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record." *Thomas*, 278 F.3d at 957 (9th Cir. 2002) (citations omitted).

The ALJ gave great weight to Dr. Daugherty and Dr. Franco's opinions that Plaintiff had only mild to moderate impairments.  AR 418.  He found their opinions were relatively consistent with those of the consultative examiner and the treatment notes of Dr. Hipolito and Dr. Weber indicating continued symptoms but improvement with medication.  Plaintiff argues that the opinions are not consistent with Dr. Hipolito and Dr. Weber's notes, which Plaintiff argues supported a finding of more than moderate impairments.  Pl.'s Mot. at 17-18.  But the ALJ did not find that Dr. Hipolito and Dr. Weber's notes supported a finding of more than mild or moderate impairments, and substantial evidence supports that finding.  So, this argument is moot.

Plaintiff's other argument is that Dr. Daugherty and Dr. Franco's opinions didn't merit great weight because they considered Plaintiff's impairments relative to the mental functioning areas of the older, pre-2017 Listings.  Under those Listings, to satisfy the paragraph B criteria a claimant had to "demonstrate at least two marked limitations in the [functional] areas of: activities of daily living, social functioning, concentration, persistence and pace, or repeated episodes of decompensation of extended duration." *Harris v. Comm'r Soc. Sec. Admin.*, 2017 WL 6450484,

United States District Court
Northern District of California

1    at *3 (D. Or. Dec. 18, 2017).  And indeed, Dr. Daugherty and Dr. Franco assigned restrictions of

2    moderate, mild, or none across those four areas.  *See* AR 76, 91.  But the ALJ didn't give weight

3    to that part of Dr. Daugherty and Dr. Franco's opinion; he referenced the portion of their opinions

4    assessing Plaintiff's RFC.  *See* AR 418.  Hence, to the extent the MDI portion of their opinions

5    was "outdated," it doesn't matter here, because the ALJ didn't use it.[12]

6          **2.**      **Plaintiff's Statements**

7         Plaintiff argues that the ALJ erred in finding his testimony inconsistent with the evidence

8    in the record.  Pl.'s Mot. at 19-20.  He asserts that the ALJ failed to identify which testimony he

9    felt was inconsistent with the record and which evidence undermined Plaintiff's complaints.  *Id.*

10         If a claimant has presented objective medical evidence of an underlying impairment and

11    there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity

12    of his symptoms only by offering specific, clear and convincing reasons for doing so.  *Lingenfelter*

13    *v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (citations omitted).  In his motion for summary

14    judgment, Plaintiff doesn't identify a single part of his testimony which he feels speaks to the

15    severity of his impairments and which the ALJ allegedly rejected.  What the ALJ rejected were

16    Plaintiff's written statements about the limiting effects of his symptoms.  *See* 413, 415.  The ALJ

17    noted that in his Disability Report and Function Report Plaintiff "contended that his impairments

18    affected his ability to memorize, complete tasks, concentrate, understand, follow instructions, and

19    get along with others." AR 415 (citing AR 182 (Form SSA-3368, Disability Report); AR 233

20    (Form SSA-3373, Function Report)).  He noted Plaintiff's "assertions that he can only pay

21    attention for a few seconds at a time or walk only four blocks before needing to rest."  AR 419

22    (*see* AR 233).  And he noted that Plaintiff reported having anger management issues and being

23    easily agitated. AR 413 (*see* AR 233).  The ALJ did note Plaintiff's January 25, 2019 testimony

24    that he had difficulty in interacting with people he didn't know and that he couldn't work due to

25    his lack of work skills and difficulty understanding instructions.  AR 415.  He also noted

26

27    _____

28    [12] This much is clear from the fact that both Dr. Daugherty and Dr. Franco assessed mild
restrictions in activities of daily living, yet the ALJ assessed Plaintiff a moderate limitation in
adapting or managing himself.

1    Plaintiff's testimony that his condition had gotten better due to his medications.  *Id.*

2    "[T]he ALJ is not required to believe every allegation of [symptoms], or else disability

3    benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."

4    *Molina v. Astrue*, 674 F.3d at 1112 (citation and internal quotations omitted).  "[A]n individual's

5    statements of symptoms alone are not enough to establish the existence of a physical or mental

6    impairment or disability."  SSR 16-3P, 2016 WL 1119029, at *2.  "[I]f an individual's statements

7    about the intensity, persistence, and limiting effects of symptoms are inconsistent with the

8    objective medical evidence and the other evidence, [the ALJ] will determine that the individual's

9    symptoms are less likely to reduce his or her capacities to perform work-related activities or

10   abilities to function independently, appropriately, and effectively in an age-appropriate manner."

11   2016 WL 1119029, at *7.  "In determining whether an individual's symptoms will reduce his . .

12   .capacities to perform work-related activities or abilities to function . . . [the ALJ] will consider the

13   consistency of the individual's own statements.  To do so, [the ALJ] will compare statements an

14   individual makes in connection with the individual's claim for disability benefits with any existing

15   statements the individual made under other circumstances."  *Id.* at *8.

16   Regarding Plaintiff's reported difficulties in following instructions and poor memory, the

17   ALJ found that "the record indicates that the claimant's memory was intact except for occasional

18   evidence of poor recent memory and difficulty following complex instructions."  AR 413 (citing

19   AR 298, 316, 344).  The record reflects this.  Dr. Catlin assessed that Plaintiff's memory was

20   severely impaired.  AR 588.  Dr. Van Gaasbeek assessed that Plaintiff's recent memory was poor,

21   but his past memory was good.  AR 316.  Treating source Sondecker noted Plaintiff's memory

22   was intact.  AR 298.  Dr. Walser noted that Plaintiff had some difficulty with complex directions

23   and would likely have difficulty with complex reasoning, but wrote that Plaintiff "was able to

24   concentrate, and his long term memory was adequate."  AR 344.  Dr. Walser also assessed

25   Plaintiff with a low-average immediate memory score after a RBANS test, and only assessed mild

26   impairment in his ability to understand or remember.  Dr. Weber's notes indicated that Plaintiff's

27   memory was "impaired somewhat," but this was based on Plaintiff's self-reporting.

28   Regarding Plaintiff's reporting that he had anger issues and an explosive temper, became

United States District Court
Northern District of California

34

easily agitated, was irritable, and had lost interest in social activities, the ALJ found that "multiple evaluations indicate[] that the claimant was polite and cooperative, [had] good impulse control, and exhibited no unusual behavior except for occasional evidence of mild hostility, low frustration tolerance, and some speech pressure." AR 413 (citing AR 315, 344, 358, 551). The record is consistent with that finding. Dr. Van Gaasbeek noted that Plaintiff "was polite and cooperative" with "no unusual behaviors." AR 315. Dr. Walser noted that Plaintiff was cooperative. At her evaluation, Plaintiff swore repeatedly and made one veiled threat about losing control if the evaluator didn't speed up his testing, but he settled down after being given the option to leave, and Dr. Walser still assessed that Plaintiff was only mildly hostile and argumentative. Dr. Hipolito noted that Plaintiff's speech was mildly pressured, but his impulse control was good. Dr. Weber noted that Plaintiff's speech was pressured, but his behavior was within normal limits and his impulse control was "within normal limits – good." Sondecker assessed that Plaintiff's behavior was "unremarkable" and his impulse control fair, and DeSouza's notes included no assessments or impressions of anger or impulse control issues. And Dr. Catlin indicated that Plaintiff "approached the examiner in a friendly and cooperative manner," AR 585, and presented as polite, open, earnest and forthright. She also noted that Plaintiff's "level of cooperation was cooperative even when faced with a difficult task." AR 588.

Regarding Plaintiff's statements about his inability to concentrate, persist, or maintain pace, the ALJ found that the record reflected that Plaintiff had periods of poor concentration and limited ability to do simple calculations, but that the overall record showed that he had good concentration, spent most of the day reading, and was able to use public transportation by himself. AR 413 (citing AR 315, 316, 588). The record reflects this. Sondecker initially assessed Plaintiff with a GAF score of 50, but later changed it to 70. Dr. Van Gaasbeek noted that Plaintiff had difficulty doing some calculations but had good concentration. AR 315. He assessed that Plaintiff's concentration, persistence, and pace were adequate. Dr. Walser noted that Plaintiff was able to concentrate and assessed only mild impairment in his ability to maintain attention and concentration for two-hour segments. Dr. Catlin assessed that Plaintiff's concentration was very poor but noted that he engaged in the evaluation and was able to sustain his attention. She noted

35

that Plaintiff was prompt but careful in his responses to tasks and appeared to be attentive to the tasks he was working on.  And Dr. Weber assessed that Plaintiff's attention and concentration were within normal limits, "good" and "intact," respectively.

The record, including Plaintiff's testimony, also supports the ALJ's finding that Plaintiff was mostly independent, able to live alone, perform household chores, engage in hobbies (reading), and use public transportation alone.  AR 414.  The ALJ found that the record indicated that Plaintiff lived alone and was able to clean his house and make meals, though there was evidence that he required his mother's assistance in paying bills and preparing meals.  AR 413. This is consistent with the record.  Plaintiff reported to Dr. Van Gaasbeek that his mother paid his bills so that he didn't have to go out in public.  AR 315.  And he reported to Dr. Catlin that he has difficulty performing his activities of daily living because he is depressed and fatigued most of the time.  AR 586.  However, he testified in January 2019 that he still lived by himself, had no one had to come to his apartment to assist him, needed nobody to remind him to take his medications, and kept a stable daily routine that included regular meals and cleaning.

To the extent the ALJ rejected Plaintiff's statements as to the limiting effects of his impairments, he gave specific and legitimate reasons for doing so, and substantial evidence supports those reasons.  Regarding Plaintiff's testimony that he had difficulty interacting with people he didn't know, the ALJ didn't find that testimony not credible.  In determining Plaintiff's RFC, he determined that Plaintiff could "tolerate occasional interaction with coworkers and no interaction with the public."  AR 414.  He determined that Plaintiff could not "perform tandem, team, or group work and interactions with coworkers [could] only be incidental to the work."  AR 414.  From that, the Court concludes that the ALJ accepted Plaintiff's testimony that he had difficulties in working with people outside his family; he just didn't accept that those limitations made Plaintiff completely unable to work.

### 3.    Whether Plaintiff's Impairments Meet or Equaled a Listing

Plaintiff argues that the ALJ erred in finding that his impairments didn't meet or equal a listing.  The ALJ evaluated whether Plaintiff met listings 12.03, Schizophrenia spectrum and other psychotic disorders; 12.04, Depressive, bipolar and related disorders; 12.08, Personality and

impulse-control disorders; and 12.11, Neurodevelopmental disorders.  Listings 12.08 and 12.11 have two paragraphs, designated A and B, and a claimant's mental disorder must satisfy the requirements of both paragraphs A and B.  Listings § 12.00(A)(2).  Listings 12.03 and 12.04 have three paragraphs, designated A, B, and C, and a claimant's mental disorder must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C.  *Id.*

Paragraph B provides functional criteria an ALJ assesses to evaluate how an impairment limits a claimant's functioning.  *Id.* § 12.00(A)(2)(b).  The criteria, which represent the areas of mental functioning a person uses in a work setting, are: [1] understand, remember, or apply information; [2] interact with others; [3] concentrate, persist, or maintain pace; and [4] adapt or manage oneself.  *Id.*  To satisfy the paragraph B criteria, a claimant's mental impairment must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning.  *Id.*; 20 C.F.R. § 404.1520a(c)(3).  An extreme limitation is an inability to function independently, appropriately, effectively, and on a sustained basis, and a marked limitation is a seriously limited ability to function independently, appropriately, effectively, and on a sustained basis.  Listings § 12.00(F)(2)(d)-(e).

To satisfy paragraph C, a mental disorder must be "serious and persistent," that is, there is a medically documented history of a listing disorder over a period of at least two years and the disorder satisfies both the C1 and C2 criterion.  Listings § 12.00(G)(2)(a).  The C1 criterion is satisfied with evidence that a claimant relies, on an ongoing basis, on medical treatment, mental health therapy, psychological support, or a highly structured setting to diminish signs and symptoms of the disorder.  *Id.* § 12.00(G)(2)(b).  C2 is satisfied with evidence that, despite diminished symptoms and signs, the claimant achieved only marginal adjustment, meaning the claimant has minimal capacity to adapt to changes in his environment or to demands that are already party of daily life.  *Id.* § 12.00(G)(2)(c).  Marginal adjustment is found "when the evidence shows that changes or increased demands have led to exacerbation of [a claimant's] symptoms and signs and to deterioration in [his] functioning[.]"  *Id.*

### a.  Paragraph B

The ALJ found that Plaintiff had only moderate limitations in each of the four areas of

37

1    mental functioning.  AR 413.

2        Regarding the ALJ's finding that he had only moderate limitations in understanding,

3    remembering, or applying information, Plaintiff argues that "the evidence of poor or impaired

4    memory was more than just occasional – it was consistently noted by Dr. Weber."  Pl.'s Mot. at

5    21.  But as discussed earlier, Dr. Weber consistently indicated that Plaintiff's memory was

6    impaired only "somewhat," and that was based on Plaintiff's self-reporting.  And as just discussed,

7    the ALJ found the record indicated that Plaintiff's memory was intact except for occasional

8    evidence of poor recent memory and difficulty following complex instructions, and the record is

9    consistent with that finding.  Substantial evidence supports the ALJ's finding that Plaintiff's

10   ability to function in this area independently, appropriately, effectively, and on a sustained basis

11   was only moderately impaired.

12       Regarding the ALJ's finding that he had only moderate limitations in his ability to interact

13   with others, Plaintiff references Dr. Walser's note that Plaintiff swore repeatedly at his evaluation

14   and made a veiled threat to his evaluator.  But as noted above, the ALJ found that except for

15   occasional evidence of mild hostility and low frustration tolerance, multiple evaluations indicated

16   that Plaintiff was polite and cooperative, had good impulse control, and exhibited no unusual

17   behavior.  The record is consistent with that finding.  Plaintiff also references his assertion to Dr.

18   Walser that he once became so upset with Sondecker that he threatened to hold a gun to his head.

19   *See* AR 342-43.  But Sondecker's treatment notes nowhere reference such an incident or note any

20   impressions Sondecker had concerning anger or impulse issues.  And Sondecker explicitly noted

21   after his last session that Plaintiff was stable, not a candidate for psychotherapy, and not a danger

22   to self or others.  AR 351.  So, there is no evidence in the record to support Plaintiff's claim that

23   he threatened Sondecker in such a way (Dr. Walser even noted that "this was not reflected in the

24   records," AR 342) and even if he did, it apparently didn't change Sondecker's impressions, or Dr.

25   Walser's—she still assessed that Plaintiff was only mildly hostile and argumentative.  Lastly,

26   Plaintiff reiterates that he isolates himself and has difficulty dealing with strangers and doesn't

27   like to be around people.  All of the evidence he cites here are his own statements, often during

28   evaluations.  *See* Pl's Mot. at 22.  But as already said, an individual's statements alone are not

United States District Court
Northern District of California

United States District Court
Northern District of California

1   enough to establish the existence of disability.  Substantial evidence in the record supports the

2   ALJ's decision to assess moderate limitations in this area.

3          On Plaintiff's ability to concentrate, maintain, or persist, he points to no particular

4   evidence and only string cites to a number of pages in the record.  He makes no attempt to explain

5   how any particular piece of evidence supports a finding of more than a moderate limitation in this

6   area.  *See* Pl's Mot. at 22-23.  As discussed in the last section, the record supports the ALJ's

7   finding that although there were instances of poor concentration, Plaintiff generally had moderate

8   impairments in this area, at most.

9          On Plaintiff's ability to adapt or manage himself, the ALJ similarly found only moderate

10  limitations.  The ALJ acknowledged evidence that Plaintiff required his mother's assistance in

11  paying bills and preparing meals.  However, he found that the record indicated that Plaintiff lived

12  alone and was able to clean his house and prepare simple meals.  The evidence reflects that.

13  Plaintiff counters that he is "able to live alone and clean his house [only] because he has adapted

14  to a highly restricted and inflexible lifestyle and because of his minimal capacity to adapt, changes

15  would make him vulnerable to decompensation."  Pl.'s Mot. at 23.  He cites to a portion of Dr.

16  Catlin's report, but the report does not say that.  *See* AR 592.  And as discussed earlier, the ALJ

17  did not err in rejecting Dr. Catlin's opinion on the severity of Plaintiff's impairments.

18          **b.      Paragraph C**

19         The ALJ found that the evidence in the record failed to establish the presence of the

20  paragraph C criteria.  AR 414.  More specifically, he found the record did not "demonstrate

21  medical treatment, mental health therapy, psychosocial reports, or a highly structured setting that

22  diminishe[d] the symptoms and signs of the claimant's mental disorder, with the claimant

23  achieving only marginal adjustment."  AR 414.

24         Plaintiff points to no evidence which he believes supports a finding that criteria C1 or C2

25  are met.  He takes issue with the ALJ's finding that he was "able to adapt to changes, including

26  being able to live alone, complete household chores, engage in hobbies (reading), and interact with

27  various treating sources."  AR 414.  None of these things, Plaintiff argues, demonstrates an ability

28  to adapt to changes.  But Plaintiff doesn't cite to any evidence demonstrating an *inability* to adapt

39

to changes.  And "marginal adjustment" in the context of paragraph C means "your adaptation to the requirements of daily life is fragile; that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life."  Plaintiff has been able to live alone for years with only minor support, without any evidence of exacerbation of his symptoms or deterioration in his functioning due to changes in his environment.  This is evidence of more than marginal adjustment.  *See* Listings § 12.00(G)(2)(c) ("[Y]ou have achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of your symptoms and signs and to deterioration in your functioning; for example, you have become unable to function outside of your home or a more restrictive setting, *without substantial psychosocial supports (*see 12.00D).") (emphasis added).  And even if the ALJ erred in finding Plaintiff's ability to live and function alone was evidence of more than marginal adjustment, he did not err in finding that criterion C1 had also not been met: from April 2016 to April 2017 and from May 2017 to September 2018, Plaintiff did not receive treatment from any provider, and there is no evidence that his symptoms were aggravated during that time (he told Dr. Weber he returned to see her after 16 months because his general practitioner told him he needed lab work).  Thus, the ALJ's conclusion was ultimately correct.

Substantial evidence supports the ALJ's finding that Plaintiff did not meet a listing.

### 4. Plaintiff's RFC

Plaintiff's argument vis-à-vis the RFC the ALJ assigned is premised on him having marked or extreme limitations in interacting with others.  Since the Court finds no error in the ALJ's conclusion that Plaintiff had only moderate limitations in this area, this argument is moot.

### 5. The Completeness of the Record

Plaintiff argues that the ALJ failed to properly develop the record because he didn't grant Plaintiff's request to subpoena Dr. Hipolito and Dr. Weber for a medical source statement.  Plaintiff's counsel testified at the January 25, 2019 hearing that Plaintiff did not obtain the form because the Schuman-Lyles Clinic required a $200 fee for completion of the form and Plaintiff was unable to pay.

"In Social Security cases the ALJ has a special duty to fully and fairly develop the record

and to assure that [a] claimant's interests are considered," and "[t]his duty exists even when the claimant is represented by counsel." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983) (citations omitted).  The ALJ told Plaintiff that he was denying the subpoena request because he already had the treatment notes from Dr. Hipolito and Dr. Weber, and that he "[wasn't] going to issue a subpoena for a document that doesn't exist yet."  AR 432.  In his motion for summary judgment, Plaintiff makes no attempt to explain how the record is incomplete without a medical source statement from the clinic when, as the ALJ explained, he already had Dr. Hipolito and Dr. Weber's treatment notes in the record before him.  Since an ALJ may properly reject a source's opinion expressed in a questionnaire when that opinion is not supported by the source's treatment notes, *see Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) (ALJ properly found doctor's conclusions in a questionnaire were not supported by his own treatment notes and rejected them), the need for such a document is not a given.  This argument fails.

### 6.    The Advanced Age Category

Plaintiff argues that, since at the time of the ALJ's decision, Plaintiff was nearing the age of 55, the ALJ erred by failing to consider whether he should have used the advanced-age medical-vocational profile.  *See* 20 C.F.R. § 416.962(b).  Defendant similarly argues that remand is necessary to allow the ALJ to consider the fact that Plaintiff was only month away from changing age categories at the time decision, and to allow the ALJ to consider whether it would be appropriate to apply the advanced age category.

The regulations contain a special advanced-age medical-vocational profile "showing an inability to make an adjustment to other work," which directs: "If you have a severe, medically determinable impairment . . . are of advanced age . . . have a limited education or less . . . and have no past relevant work experience . . . we will find you disabled."  20 C.F.R. § 416.962(b) (citations omitted); *see also* SSR 82-63 (Social Security Administration policy "directs a finding of disability where a person has a severe impairment of any nature, is of advanced age, has only the limited educational competence required for unskilled work, and has no work experience at all or no recent and relevant work experience.").  Furthermore, the Social Security Administration has informed that in applying a claimant's age category as a vocational factor in determining disability

United States District Court
Northern District of California

1    status:

2
> We will not apply the age categories mechanically in a borderline
> situation.  If you are within a few days to a few months of reaching
> an older age category, and using the older age category would result
> in a determination or decision that you are disabled, we will consider
> whether to use the older age category after evaluating the overall
> impact of all the factors of your case.

3

4

5

6    20 C.F.R. § 404.1563(b).  The Ninth Circuit has read the regulations to direct that "[w]hen a

7    claimant is within 'a few months of reaching an older age category,' the ALJ is required to

8    demonstrate that she considered 'whether to use the older age category . . . .'"  *Little v. Berryhill*,

9    690 Fed. Appx. 915, 917 (9th Cir. 2017) (quoting *Lockwood v. Comm'r SSA*, 616 F.3d 1068, 1071

10   (9th Cir. 2010)).  The ALJ must consider the claimant's age as it is at the time of the decision, not

11   at the time of application.  *Little*, 690 Fed. Appx. at 917 (citing *Lockwood*, 616 F.3d at 107-72).

12   And there must be some evidence in the record that the ALJ did so.  *See Little*, 690 Fed. Appx. at

13   917 ("The ALJ erroneously failed to show that she considered placing [the claimant] in a higher

14   age category.").  An ALJ can meet this requirement by, among other things, "citing the claimant's

15   age at the time the ALJ renders her decision and the applicable regulation," 20 C.F.R. § 404.1563.

16   *Little*, 690 Fed. Appx. at 917 (citing *Lockwood*, 615 F.3d at 1071-72).

17           In this case, although the ALJ's decision stated Plaintiff's birth date and cited the relevant

18   regulation, 20 C.F.R. § 404.1563, it only stated Plaintiff's age at the time of application (49 years

19   old).  *See* AR 419.  And although the ALJ asked the vocational expert to consider a hypothetical

20   person of the "same age" as the Plaintiff when opining on the availability of jobs in the national

21   economy, there is no evidence in the record that the ALJ considered Plaintiff's age at the time of

22   his decision.  Thus, after reviewing the record, the evidence is ambiguous; the Court cannot be

23   sure that the ALJ considered the fact that Plaintiff was approaching advanced age, especially since

24   several years had passed between the date Plaintiff filed his application and the date of the ALJ's

25   decision.  Accordingly, the Court will order a limited remand to allow the ALJ to consider

26   whether to use the advanced age category for any portion of the alleged period of disability.

27

28

1

### 7.     Defendant's Argument for Remand

Defendant's only other argument is that remand is necessary for the ALJ to determine if Plaintiff was in fact disabled.  Defendant argues that it was error for the ALJ to simply credit Plaintiff's testimony as to the severity of his symptoms and extent of his impairments.  *See* Def.'s Mot. at 5-7.  "'Ultimately,'" Defendant points out, "'a claimant is not entitled to benefits under the statute unless the claimant is, in fact, disabled, no matter how egregious the ALJ's errors may be.'"  *Id.* at 7 (quoting *Strauss v. Comm'r of the Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011).  At the same time, Defendant argues that the evidence in the record "raises considerable doubt as to whether Plaintiff has any further limitations than those found by the ALJ."  Def.'s Mot. at 8.  Defendant's strategy here seems to be an attempt to have the Court reverse in the hopes that the ALJ would determine on remand that Plaintiff suffered from less severe limitations than he found before. (Plaintiff points out that the ALJ's findings lead to the conclusion that as a matter of law Plaintiff was disabled under the Guidelines as of his 55th birthday, and he asserts that he filed a subsequent claim for Title XVI benefits after he turned 55 and had his claim approved at the initial level.  Reply at 6-7, ECF No. 21.)  However, the ALJ thoroughly considered and balanced the evidence and reached a conclusion that was supported by substantial evidence in the record.  He did not simply credit Plaintiff's statements as to the limiting effects of his impairments.  Accordingly, remand on this ground is not warranted.  The Court will remand only to allow the ALJ to consider whether to apply the advanced age category for any portion of the alleged disability period.

## VI.   CONCLUSION

For the reasons stated above, the Court **GRANTS** Plaintiff's motion **IN PART** and **DENIES** it **IN PART**, and **GRANTS** Defendant's cross-motion **IN PART** and **DENIES** it **IN PART.**  The Court **REMANDS** this case to allow the ALJ to consider whether to apply the advanced age category for any portion of the alleged disability period.  Separately, the Court will enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

United States District Court
Northern District of California

Dated: July 27, 2020

THOMAS S. HIXSON
United States Magistrate Judge

United States District Court
Northern District of California